PAUL B. SNYDER
United States Bankruptcy Judge
1717 Pacific Ave, Suite 2209
Tacoma, WA 98402

✓ FILED
___ LODGED
___ RECEIVED

**August 3, 2007**

MARK L. HATCHER
CLERK U.S. BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA
_____DEPUTY

# UNITED STATES BANKRUPTCY COURT
# WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| In re:<br><br>PACIFIC NORTHWEST STORAGE LLC,<br><br>                 Debtor. | Case No. 06-42582 |
| ROBERT K STEWART,<br><br>                 Plaintiff,<br><br>  v.<br><br>RUSTY FIELDS and JULIE FIELDS, a married couple, and TIMOTHY DONOVAN, a single man,<br><br>                 Defendants. | Adversary No. 06-04198<br><br>**MEMORANDUM DECISION**<br><br>**NOT FOR PUBLICATION** |

This matter came on for a three day trial commencing June 11, 2007. Closing arguments were heard on July 2, 2007. In accordance with his complaint, Robert K Stewart (Stewart) seeks an order disallowing the claim of Timothy Donovan (Donovan) against Pacific Northwest Storage LLC (Debtor) and awarding him the proceeds of the sale of the real property and improvements located at 112 168th Street South, Spanaway, Washington (Property). Stewart also seeks damages against Donovan and Rusty and Julie Fields

MEMORANDUM DECISION - 1

(collectively referred to herein as Defendants). Based on the evidence and arguments presented, and pleadings and exhibits submitted, the Court makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

Stewart is a resident of Mooresville, Indiana. In early 2000, Dustin Wittell (Wittell) informed Stewart about an investment opportunity in Tacoma, Washington. Wittell's cousin is Julie Fields. Stewart was advised by Wittell that a mini-storage facility was being constructed on the Property by a company called Pacific Development Group. Pacific Development Group was formed by Patrick Sherrell in 1998. Rusty Fields (Fields) worked for Pacific Development Group at the time.

Wittell informed Stewart that additional financing was needed in order to complete the purchase of the Property and construction of the facility. Stewart agreed to assist financially. In completing the project, Stewart through D&R Properties, LLC (D&R), provided approximately $800,000 in financing. Wittell was also a member of D&R. The loan from D&R was secured by a deed of trust on the Property.

The seller of the Property, Ernie Posick (Posick) was the holder of a first position promissory note and deed of trust on the Property in the original amount of $270,000, and Michael Sanderson held a second position deed of trust on the Property. Thus, on March 20, 2001, the Property was subject to three deeds of trust, with the deed of trust held by D&R being in third position. Joel Feldman (Feldman) was named as the Trustee on each of the deeds of trust. On March 27, 2001, Feldman executed a full reconveyance of the deed of trust in favor of D&R.

Once construction of the facility was completed, title to the Property was transferred to D&R. In August, 2000, Stewart formed the Debtor. The Debtor's members were Stewart and Wittell. Title to the Property was then transferred to the Debtor.

In 2002, the project was completed and began accepting customers. Julie Fields handled the day-to-day operations of the mini-storage facility. While in operation, Stewart visited the facility on three occasions.

On June, 13, 2002, the Sanderson deed of trust was assigned to Westside Community Bank (Westside) to secure a loan in the approximate amount of $600,000. Posick subordinated his deed of trust in favor of Westside. In January, 2003, the Debtor granted Stewart a promissory note in the amount of $600,000 for the funds he had provided to construct and operate the storage facility (January 2003 Note). A second note, which by its terms supersedes the January 2003 Note and incorporates the debt, was signed on August 1, 2005 (August 2005 Note). The August 2005 Note provides for a due date of June 1, 2006. The August 2005 Note is secured by a deed of trust executed on the same date.

On April 14, 2005, Wittell signed an Agreement and Transfer of Membership Interest transferring his interest in the Debtor to Stewart. On or about September 29, 2005, Wittell filed a Chapter 7 bankruptcy petition in the Southern District of Indiana.

The Property was subsequently listed for sale by Darren Williams (Williams) of Windermere Real Estate. Williams and Rusty Fields met while they were serving time in federal prison. On or about August 26, 2005, the Debtor entered into a Commercial and Investment Real Estate Purchase and Sale Agreement with O. Wayne Jackson, L.L.C. (Jackson), to purchase the Property for a price of $1.875 million. A Real Estate Contract was entered into on October 26, 2005. Jackson paid the Debtor a down payment of approximately

$470,000. The balance of the purchase price was to be paid within 12 months. From the down payment, Williams received a real estate commission of $100,000. Of this amount, Williams paid $25,000 to Julie Fields. The remainder of the down payment, $370,000, was received by Stewart's investment company through the Debtor.

On March 8, 2006, Stewart signed an Assignment and Endorsement of Promissory Note for the January 2003 and August 2005 Notes, assigning them to Timothy Donovan (Donovan). Donovan is Feldman's stepson. An Assignment of Deed of Trust was executed by Stewart and notarized on March 9, 2006, assigning the deed of trust dated August 1, 2005, to Donovan. The Assignment of Deed of Trust was recorded on March 17, 2006. The assignment of the notes and deed of trust are collectively referred to herein as the Assignments. In exchange for the Assignments, Stewart received $58,000 from Donovan.

By letter dated June 28, 2006, counsel for Donovan notified the Debtor that it was in default under the promissory notes assigned to him. The letter indicated that the total amount owing as of June 28, 2006, was $938,431.08, plus attorney's fees. A Notice of Default dated August 3, 2006, was sent to the Debtor demanding payment of the entire principal amount due on the promissory note of $600,000, plus interest and a late fee, for a total amount in arrears of $953,959.12. The Notice of Default also demanded attorney's fees and costs of $825.00.

The Debtor filed a voluntary Chapter 11 bankruptcy petition on October 26, 2006. On that same date, the Debtor filed a motion to approve the sale of the Property to Jackson, with the proceeds of the sale to be sequestered pending further order of the Court. The Debtor's motion was objected to by Donovan. After a hearing held November 22, 2006, the Court entered an order on November 29, 2006, approving the sale of the Property to Jackson

pursuant to the Real Estate Contract dated October 26, 2005. From the proceeds, approximately $580,000 was disbursed to Westside Community Bank and approximately $234,000 to Posick. The remaining proceeds of $605,088.20, were deposited in Stewart's attorneys' trust account.

Stewart filed this adversary complaint against Donovan and Rusty and Julie Fields on October 31, 2006. On November 1, 2006, the Debtor filed a motion to disallow the claim, which was yet unfiled, of Donovan.

## CONCLUSIONS OF LAW

At the trial, counsel for Stewart indicated that the causes of action at issue before the Court are as follows: (1) fraud, (2) negligent misrepresentation, (3) unilateral mistake, (4) constructive trust, and (5) unjust enrichment. As each of these claims is based on state law, rather than the bankruptcy code, the Court must look to Washington state law to determine whether Stewart will prevail. See, e.g. Butner v. United States, 440 U.S. 48, 55, 99 S. Ct. 914, 918 (1979) (determination as to a party's property rights is dependent upon state law).

As a preliminary matter, there has been no evidence provided indicating that Julie Fields participated in the alleged fraudulent acts or made any misrepresentations to Stewart, negligent or intentional; accordingly, all claims as to her are dismissed.

**1. Fraud**

The nine elements required to establish fraud under Washington state law are: (1) a representation of an existing fact; (2) the fact is material; (3) the fact is false; (4) the defendant knew the fact was false or was ignorant of its truth; (5) the defendant intended the plaintiff to act on the fact; (6) the plaintiff did not know the fact was false; (7) the plaintiff relied on the

MEMORANDUM DECISION - 5

truth of the fact; (8) the plaintiff had a right to rely on it; and (9) the plaintiff had damages. Baertschi v. Jordan, 68 Wn.2d 478, 482, 413 P.2d 657 (1966). "Fraud is never presumed, but must be proved by clear, cogent, and convincing evidence." Baertschi, 68 Wn.2d at 483.

Fields and Donovan argue that Stewart's fraud claim fails because he did not establish by clear, cogent and convincing evidence that (1) the Defendants misrepresented a material fact, and (2) even if this element had been established, Stewart has failed to show that he had a right to rely on the misrepresentation.

The crux of a fraud claim is that there must have been a known material misrepresentation. In this case, Stewart alleges that Fields, in collusion with Donovan and Feldman, misled him as to the effect of the Assignments. Stewart argues that Fields led him to believe that in signing these documents, he was not assigning Donovan his interest in the promissory note, but was instead assigning the right to pursue a claim against the title insurance or escrow company for alleged defects relating to the sale of the Property to Jackson. The Defendants deny that any such misrepresentations were made.

Stewart has failed to present sufficient evidence to collaborate his allegations. No documents, emails or letters were submitted into evidence that support his recitation of the facts. Thus, in order for Stewart to prevail, the Court must find that his testimony alone provides clear, cogent and convincing evidence that the misrepresentations occurred. When questioned as to the facts of the alleged assignment of a claim against the title and escrow company, however, Stewart could not provide any specifics regarding the claim or what it was he was led to believe he was actually selling. Stewart acknowledged that he understood that he could not bring such a claim on his own behalf. Thus, if Stewart is to be believed, he sold

MEMORANDUM DECISION - 6

a claim that he cannot describe and that he understood had no value to him, to Donovan for $58,000, after initially requesting $100,000.

Evidence was submitted that contradicts Stewart's allegations. For example, the Defendants submitted a memo to file from Carol Hartman, an escrow manager at Ticor Title, dated August 24, 2006, summarizing a telephone call with Stewart. In this conversation, Stewart allegedly informed Hartman that he was told by Donovan that the note and deed of trust at issue were uncollectible and that Donovan had offered to purchase them from Stewart for ten cents on the dollar. Such statements contradict Stewart's testimony that he believed he was instead assigning a claim against the title company and that he never personally spoke to Donovan. In that same memo, Hartman summarizes a subsequent call from Sherry Stewart, the Plaintiff's wife, that again appears to collaborate the Defendants' statement of the facts. Hartman wrote: "Mrs. Stewart called to state that the deed of trust was not showing on the Real Estate Contract between Jackson/Pacific Northwest. This is why they believed the note was uncollectible and gave their interest to Mr. Donovan." (Defendants' Exhibit 42). Nothing was provided to contradict this evidence. Rather, these statements appear to indicate that Stewart believed he assigned the note to Donovan because it was "uncollectible." As with the Assignment documents, no mention was made of an assignment of a claim against the title or escrow company.

It is obvious that Stewart made a bad bargain. He assigned a note and deed of trust securing a claim of $600,000, for $58,000 dollars. The Assignments were signed by him in March, 2006, and the sale to Jackson was approved by the bankruptcy court several months later in November, 2006. The fact that he made a bad bargain, however, is not evidence that a misrepresentation was made. When the Assignments were executed, the testimony was

MEMORANDUM DECISION - 7

that Stewart was concerned about Wittell's upcoming bankruptcy and, despite the over $400,000 down payment, skeptical about the ability of the pending Jackson sale to close. His note and deed of trust were in third position behind Westside Community Bank and Posick. Although the sale did close shortly thereafter, and there were funds available to pay the note, there was no guarantee that this would occur at the time the Assignments were signed. A court cannot award damages merely because a party made a bad bargain.

The Court acknowledges that Fields' credibility in this case is questionable because of his prior conviction for fraud. The burden, however, is on Stewart to prove by clear, cogent and convincing evidence that fraud occurred. As stated above, fraud cannot be presumed. There is a high burden to meet and the evidence presented simply does not collaborate Stewart's claims. Based on the evidence and testimony provided, the Court does not find Stewart's testimony to be credible and he has failed to meet the burden required of clear, cogent and convincing, that Fields or Donovan misrepresented the effect of the Assignments.

Further, in regards to Donovan, it is undisputed that Donovan did not make any misrepresentations to Stewart directly. The only misrepresentations alleged to have been made were by Fields. In order for Stewart to prevail in a fraud claim against Donovan, he would have first have had to prevail on his fraud claim against Fields, and then he would have had to establish that Fields' fraud should be imputed to Donovan. As Stewart has failed to establish fraud by Fields, his claim against Donovan likewise fails.

Assuming, arguendo, that Stewart had established fraud by Fields, a fraud claim against Donovan would still fail, because he has not provided sufficient evidence that such fraud should be imputed to him. At trial, the parties acknowledged that Donovan was essentially a strawman in this transaction. Although the $58,000 was provided by Donovan

from funds received from his father's estate, it is obvious that all of the financial decisions were made by his step-father, Feldman. It is Feldman that Stewart alleges was really in collusion with Fields. Thus, to take it even a step further, as there is likewise no allegation that Feldman directly misrepresented any facts to Stewart, Stewart would be required to demonstrate that Fields' fraud should be imputed to Feldman, and then imputed to Donovan, who is the named defendant in this case.

Stewart provides no legal authority for imputing such fraud to Donovan, other than to state that Fields, Feldman and Donovan were in "collusion." Collusion is defined as "an agreement between two or more persons to defraud another of his rights." 37 Am. Jur. 2d Fraud and Deceit § 5. The burden is on Stewart to present evidence of collusion. State v. Dold, 44 Wn. App. 519, 523, 722 P.2d 1353, 1356 (1986).

It is undisputed that Feldman was involved in the mini-storage project on several levels, including attorney for Posick, and trustee on several of the various deeds of trust that were executed throughout the project. He also had a close relationship with Fields, in that he assisted Fields in his bankruptcy, owns the home Fields currently resides in, and Fields apparently sends him leads for hard money loans. Despite the extensive relationships between the various parties, however, there is no evidence of an agreement between the parties to defraud Stewart. The Court acknowledges that evidence of such an agreement would be difficult to produce as rarely would defendant parties admit to such an agreement. At least some evidence is required, however, and Stewart has only offered conclusory allegations. The extensive relationships between the parties, standing alone, are not improper in themselves. There is no evidence that Fields benefited financially from the Assignments (other than his wife, Julie Fields, receiving $25,000 from Williams out of the

$100,000 commission from the sale to Jackson) or that he personally had a financial incentive to mislead Stewart as to the Assignments' effect. Stewart has failed to establish that any alleged misrepresentation by Fields should be imputed to Feldman or Donovan.

In addition, assuming once again that Stewart had established the existence of a material misrepresentation, he also has to establish that he had a right to rely on the misrepresentation. Fraud requires that any reliance placed upon a representation be reasonable under the circumstances. Skagit State Bank v. Rasmussen, 109 Wn.2d 377, 384, 745 P.2d 37, 41 (1987).

Stewart's testimony was that he did not read the documents before signing them and instead relied on Fields to explain to him the legal effect of the documents he signed. According to Stewart, it was justifiable to rely on Fields in this manner because he had relied on Fields as an advisor concerning the Property for the last six years. Stewart, however, is an experienced business man with a masters in education and extensive real estate experience, who had been involved in numerous prior real estate transactions, including over 20 property partnerships. On prior occasions, Stewart sought the advice of his Indiana legal counsel prior to executing legal documents related to his business ventures. Further, emails admitted as Plaintiff's Exhibit 26, conclusively establish that Mrs. Stewart utilized their Indiana attorney on other matters involving the mini-storage facility. It was not reasonable in this case for Stewart to not read obvious important documents, exclusively rely on Fields, an unpaid business acquaintance, and not seek the advice of his personal attorney, who was consulted extensively in other aspects of the storage project. Although Stewart alleges that he did not read the Assignments before signing, Stewart admitted that his wife did read the documents and questioned him about their effect. He acknowledged that she informed him that they did

not seem to be accomplishing what he intended. Despite her misgivings, he still did not read the documents or have his counsel review them. Stewart's failure to take any steps to understand the documents he was signing, especially after the questions raised by his wife, was not reasonable. This is not a case where the documents were misleading. Even if he did not read the entire documents, the caption of the single page note assignment he signed states clearly across the top in bold letters "Assignment and Endorsement of Promissory Note." The caption itself would put a reasonable person on notice that a note was being assigned.

Stewart does not dispute that he signed the Assignments. Although he testified that he did not read the agreements, even if such testimony is found credible, he is charged with knowledge of the contents of a document he signs. Parties have a duty to read a document they sign and one who voluntarily signs an agreement cannot later attempt to avoid the contract based on ignorance of its contents. See, e.g., Del Rosario v. Del Rosario, 152 Wn.2d 375, 385, 97 P.3d 11, 16 (2004); Skagit State Bank, 109 Wn.2d at 381.

Stewart relied on Fields throughout their relationship. In light of the facts of this case, however, including the plain language of the documents, Stewart's business experience, prior involvement of his Indiana attorney, and the questions raised by his wife, Stewart has failed to establish by clear, cogent and convincing evidence that he had a right to rely on Fields, or that Fields or Donovan made any misrepresentations. Stewart's fraud claims against Fields and Donovan fail.

MEMORANDUM DECISION - 11

## 2. **Negligent Misrepresentation**

Washington has adopted the Restatement (Second) of Torts in regards to negligent misrepresentation. ESCA Corp. v. KPMG Peat Marwick, 135 Wn.2d 820, 826, 959 P.2d 651, 654 (1998). The Restatement (Second) of Torts § 552(1) (1977) provides:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

A plaintiff must prove each element of a negligent misrepresentation claim by clear, cogent and convincing evidence. Westby v. Gorsuch, 112 Wn. App. 558, 576, 50 P.3d 284, 294 (2002).

As with the fraud claim, this claim fails because Stewart has not established by clear, cogent and convincing evidence that a misrepresentation, negligent or intentional, was made.[1] There is insufficient evidence, as more fully set forth above, that Fields, or Donovan, or both in collusion with Feldman, supplied any false information to Stewart.

As Stewart has failed to establish a claim for fraud or negligent misrepresentation against Fields or Donovan, Stewart has failed to establish a claim for damages. The remaining causes of action seek reformation or rescission of the contract. If successful on any of these claims, Stewart's remedy is limited to recovery of the funds held in trust.

---

[1] If Stewart had established negligent misrepresentation by clear, cogent and convincing evidence, unlike with the fraud claim, Stewart's contributory negligence would not be a bar to recovery. Rather, the Washington State Supreme Court has determined that comparative negligence applies to negligent misrepresentation claims. Thus, Stewart's negligence in relying upon the misrepresentations would not be a complete bar. Rather, any damages established would be reduced proportionally to the extent of Stewart's own negligence in causing or increasing his damages. Lawyers Title Ins. Corp. v. Baik, 147 Wn.2d 536, 551-52, 55 P.3d 619, 627 (2002).

MEMORANDUM DECISION - 12

### 3. <u>Unilateral Mistake</u>

A party is entitled to reformation of a contract for unilateral mistake when there is a valid antecedent agreement and he or she has been induced by the other contracting party's inequitable conduct to mistakenly enter into a written agreement that does not reflect the antecedent agreement. <u>Gammel v. Diethelm</u>, 59 Wn.2d 504, 508, 368 P.2d 718, 721 (1962). A party acts inequitably if it knowingly conceals a material fact from the other party and has a duty to disclose that knowledge to the other party. <u>Washington Mut. Sav. Bank. v. Hedreen</u>, 125 Wn.2d 521, 526, 886 P.2d 1121, 1123 (1994). A plaintiff must prove unilateral mistake by clear, cogent and convincing evidence. <u>Wilhelm v. Beyersdorf</u>, 100 Wn. App. 836, 843, 999 P.2d 54, 59 (2000).

Negligence is not a bar to reformation of a contract based on unilateral mistake. <u>Washington Mut. Sav. Bank</u>, 125 Wn.2d at 529. "It is not determinative that the mistaken party could have noticed the discrepancy between his understanding and the written agreement by reading the documents." <u>Mitchell Int'l Enters., Inc. v. Daly</u>, 33 Wn. App. 562, 565, 656 P.2d 1113, 1116 (1983). Thus, it is not a bar to reformation of the contract under this theory that Stewart could have discovered the mistake between his alleged understanding of the Assignments and the actual effect by merely reading the documents.

The alleged mistake in this case is signing documents that transferred Stewart's secured claim of $600,000 to Donovan for $58,000, rather than transferring a right to pursue a claim against the title company as allegedly intended. Similar to the fraud and negligent misrepresentation claims, however, Stewart must still show inequitable conduct on the part of the Defendants in order to prevail on this claim. As with those claims, Stewart did not establish by clear, cogent and convincing evidence any inequitable conduct by Fields,

MEMORANDUM DECISION - 13

Donovan, or the two together with Feldman, or that they concealed a material fact from Stewart. The inequitable conduct in this case would be a failure to disclose that Stewart was assigning away his interest in the note rather than a right to pursue a claim against the title company. Fields argues that this was disclosed. Stewart argues that he was misled. As stated previously, Stewart has failed to meet the burden of proof required in establishing that he was misled by clear, cogent and convincing evidence.

### 4. **Constructive Trust**

"Where for any reason the legal title to property is placed in one person under such circumstances as to make it inequitable for him to enjoy the beneficial interest, a trust will be implied in favor of the person entitled thereto." Scymanski v. Dufault, 80 Wn.2d 77, 88, 491 P.2d 1050, 1057 (1971). Constructive trusts may be imposed "when there is clear, cogent and convincing evidence of the basis for impressing the trust." Baker v. Leonard, 120 Wn.2d 538, 547, 843 P.2d 1050, 1054 (1993).

"While fraud, misrepresentation, bad faith, or overreaching generally provide the rationale for the imposition of a constructive trust . . . constructive trusts are also imposed in broader circumstances not arising to fraud or undue influence." Baker, 120 Wn.2d at 547 (citations omitted). However, there still must be "'some element of wrongdoing'" in order to impose a constructive trust. Baker, 120 Wn.2d at 548 (quoting Peste v. Peste, 1 Wn. App. 19, 23, 459 P.2d 70, 74 (1969)).

As stated above in more detail in the discussion of the claim of fraud, although actual fraud is not required, there still must be some level of wrongdoing in order to impose a constructive trust. As with the prior claims, this wrongdoing must be established by clear,

MEMORANDUM DECISION - 14

cogent and convincing evidence. Evidence of any wrongdoing on the part of the Defendants has not been provided by clear, cogent and convincing evidence.

### 5. **Unjust Enrichment**

Unjust enrichment is a basis for recovery for a contract implied in law and occurs when a person retains money or benefits which in justice and equity belong to another. Three elements must be established in order to sustain a claim based on unjust enrichment: a benefit conferred upon the defendant by the plaintiff; an appreciation or knowledge by the defendant of the benefit; and the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value. Bailie Commc'ns., Ltd. v. Trend Bus. Sys., Inc., 61 Wn. App. 151, 159-60, 810 P.2d 12, 17-18 (1991), amended by 814 P.2d 699 (1991).

As stated above, unjust enrichment is a claim based on a contract implied at law or quasi contract claim. A quasi contractual obligation is a legal fiction imposed by courts to permit recovery in those cases where there is no valid contract to assure a just and equitable result. A quasi contract is not based on consent or agreement, but "arises from an implied duty of the parties" and other equitable principles to prevent unjust enrichment. See Heaton v. Imus, 93 Wn.2d 249, 252, 608 P.2d 631, 632 (1980). Therefore, a party to a valid express contract may not bring an action on a quasi contract theory related to the same subject matter. Chandler v. Washington Toll Bridge Auth., 17 Wn.2d 591, 604, 137 P.2d 97, 103 (1943); MacDonald v. Hayner, 43 Wn. App. 81, 85-86, 715 P.2d 519, 522-23 (1986). A party who, pursuant to a contract with another, has transferred property to the other, is not entitled to compensation "other than in accordance with the terms of such bargain, unless the

MEMORANDUM DECISION - 15

transaction is rescinded for fraud, mistake, duress, undue influence or illegality." Restatement (First) of Restitution § 107(1) (1937).

A contract implied in fact is not a quasi contract. A contract implied in fact is an "agreement depending for its existence on some act or conduct of the parties sought to be charged, and arises by implication from circumstances which, according to common understanding, show a mutual intention on the part of the parties to contract with each other." 25 Wash. Prac., Contract Law And Practice § 1.16 (2007) (citations omitted). In this case, Donovan negotiated a check payable to Stewart for $58,000 on March 1, 2006. In exchange for this consideration, Stewart executed the Assignments documents shortly thereafter. The conduct of the parties and accompanying documents evidence an agreement to assign Stewart's interest in the note and deed of trust to Donovan for an agreed upon price. Due to the existence of this agreement between the parties, Stewart is not entitled to recover under a quasi contract theory. Stewart has not demonstrated a valid basis for rescinding the Assignments. Stewart is therefore not entitled to any more than what was bargained for. Although in hindsight, Stewart clearly made a poor decision in assigning the note and deed of trust, the enrichment of one party at the expense of the other is not unjust where it is permissible under the terms of the parties' agreement, either express or implied. See Chandler, 17 Wn.2d at 600-01.

The Court additionally notes that Stewart has not been entirely blameless throughout these proceedings. A person seeking equitable relief must have clean hands. Income Investors v. Shelton, 3 Wn.2d 599, 602, 101 P.2d 973, 974 (1940). As Ticor Title Company was preparing to make disbursements from the Jackson sale, Stewart signed an Indemnification of Lost Deed of Trust and Original Note and Request for Full Reconveyance

MEMORANDUM DECISION - 16

dated August 21, 2006 (Indemnification), alleging that the August 1, 2005 Note and accompanying deed of trust were lost. At the time this document was signed, the evidence establishes that Stewart was aware that Donovan was claiming that these same documents had been assigned to him. Stewart has not denied that he received the June 28, 2006 letter from Donovan's attorney, nor the August 3, 2006 Notice of Default. Thus, even if the Court were to accept Stewart's allegations that he was mistaken as to the effect of the Assignments when executed in March of 2006, it is undisputed that Stewart was aware that Donovan was claiming that the note and deed of trust had been assigned to him at the time the Indemnification was signed. Also indicative is a voicemail message from Sherry Stewart to Rusty Fields on August 21, 2006 (same date the Indemnification was signed) stating:

> You know, I'm going to have to provide the original deed of trust for Pacific Northwest Storage to Robert Stewart, um, and because I don't have the original, they're going to go through Chicago Title to do that and I said when they do that they'll come up with the fact that the deed of trust has then, um, conveyed to somebody else. Um, I obviously couldn't ask any questions about that with the lady at Ticor.

Defendants' Exhibit 81.

Stewart never did advise Ticor Title Company of the Assignments to Donovan. Based on an email from Carol Hartman to Sherry Stewart, Ticor Title Company did not become aware of the Assignments until August 24, 2006. See Defendants' Exhibit 44. Thus, rather than simply informing the title company of the Assignments and the fact that he disputed their validity, the evidence establishes that Stewart failed to disclose their existence and instead alleged that the note and deed of trust had been lost. Through its own investigations, the title company discovered the Assignments before the funds could be disbursed. Even if the Court were to accept Stewart's allegations that he had been misled or mistaken, the Court cannot condone their actions with regard to the title company.

MEMORANDUM DECISION - 17

In summary, the Court concludes that Stewart has failed to demonstrate a legal basis for ordering relief in accordance with his complaint. The Court acknowledges that Stewart made extremely poor decisions in this case and the Court is sympathetic to the plight in which he now finds himself. Contrarily, with very little work or risk, Feldman secured a benefit for his stepson Donovan, who is the recipient of a significant monetary gain. These obvious facts, however, are insufficient for a court to undo a bargained for transaction. A legal basis for affording relief must exist and be proven according to the legal standard required. Unfortunately, no such basis exists in this case.

DATED: August 3, 2007

*/s/ Paul B. Snyder*
_____
Paul B. Snyder
U.S. Bankruptcy Judge